## W. H. McClellan et al. v. The State.

No. 15836.   Delivered November 22, 1933.
Reported in 65 S. W. (2d) 317.

The opinion states the case.

*H. B. Galbraith,* of Brownsville, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for conspiracy to commit murder; punishment, two years in the penitentiary against each appellant.

This court has written three or four opinions dismissing this appeal for one defect or another, and finding these defects to have been remedied, said opinions will be withdrawn.

We consider in this case but the question of the sufficiency of the testimony to corroborate the accomplices Ruthven, Lepley, Cheney, Singleterry and Guzman, all of whom testified for the state.

Weaver, Hooks and Ridgway seem from this record to have headed one faction struggling for control of the Donna Irrigation District in Hidalgo county. They had elected their officers apparently for some time, and were again successful at an election held January 12, 1932. Lepley, Cheney and Ruthven belonged to the opposing faction. There was evident bitterness of feeling. Illustrative,—we quote from the testimony of Ruthven:

"Now, it appeared that the only way out of this dilemma in which our community was situated was the killing of these three men; it looked that way at that time. * * *

"Us three men, in our desperation, to relieve what we thought was an unbearable situation down there, made up our minds to take life; we wasn't going to do it; but we were going to have it done. It looked like that was the only way out."

According to their testimony these men turned to Singleterry as a man who would go in with them and procure a Mexican, who for money would kill said three men. Singleterry agreed to this and made a date for these men to meet a Mexican named Guzman. Ruthven, Cheney and Singleterry met Guzman, who agreed to kill said men, or have his brother do it, for a consideration of $250.00, of which amount they paid him $50.00. Ruthven wrote on the envelope containing this money the names of the men to be killed,—Weaver, Hooks and Ridgway,—and gave it to Singleterry, who in turn gave it to Guzman. A part of said plan was to raise $500.00,—$250.00 to be paid the Mexican as above stated, and $250.00 was to be divided between Ruthven, Cheney and Singleterry. Lepley's part of the conspiracy was chiefly to raise this money with which to pay for the killing. This was a necessary part of the plan and conspiracy. Lepley testified that he went out with Ruthven and Cheney to see Singleterry for the purpose of making a trade to get the three men above named, killed.

Lepley talked to the appellants herein in McClellan's garage. They were in favor of doing something to "eliminate" said three men. He testified that Ruthven and Cheney suggested this method of effecting a change in the administration. He further testified: "It was started by Ruthven and Cheney, and then later all of the defendants came in on it, and agreed to it. * * * The plan of elimination of these three men to have them killed was a plan of Mr. Cheney, Mr. Ruthven, Mr. Singleterry and myself. And when I discussed with these men (indicating the defendants on trial at this time) the elimination, I told them merely we had an ironclad plan, a fool-proof plan to get rid of these three men—we thought we had."

This witness further testified that the money, the $500.00, was delivered to him by McClellan, and was delivered by him to Singleterry, who gave $50.00 of it to Guzman, and was to give him the other $200.00 "when the job was done." Lepley testified that he met the appellants at McClellan's garage. Mr. Moye, not an accomplice, testified that on the night of February 13, 1932, he saw McClellan, Dargle, Shultz and Lepley in McClellan's garage at about 8:30 o'clock. His attention was attracted by seeing these men go to said garage, and because there had been talk of contesting the election, he thought he would see if he could find out what was going on, so he went over and stood near a window where he could hear what was being said. He said they were talking about raising money "To have the job done." He further said that Lepley and McClellan were doing most of the talking. The "job they wanted done" was to

get rid of Hooks, Ridgway and Weaver. He said they were talking about getting up money; it was just a general conversation to see how much money they could get up to pay some fellow. He said:

"The men I have named were all the men I recognized, and I recognized all of them that were in my vision at that time. At the request of counsel, I will just name them again: Mr. Shultz, Mr. Dargle, Mr. Lepley and Mr. McClellan.

"I said they were having a conversation discussing about the raising of money. As to what was said about the raising of the money, I will state, they wanted each one to raise as much as he could; there wasn't any special plan about it, or whether it was to come out of their own pocket, but the plan was to get the money. *They all agreed to raise the money.*"

The only other testimony upon which the state can possibly rely for corroboration of the accomplices, is that of the three gentlemen whose death was claimed by the state to be the object of the conspiracy to murder sought to be established against these appellants. They testified that they saw the appellants and other person in and around McClellan's garage near or about the time that it is claimed the conspiracy was in progress of development.

This court hesitates to reverse cases for insufficiency of facts, but occasionally cases come here in which the facts fall so far short as to require us to hold them insufficient.

Conceding that the testimony of the accomplices does make out a case of guilt against at least three of these appellants, we are unable to bring ourselves to a belief that the record herein reflects that character of corroboration which should be required in order to meet the measure of the statute. Granting that a conspiracy had been formed by Ruthven, Cheney and Lepley having for its object the killing of the three parties named, and that in order for this conspiracy to be carried out it became necessary to raise from outside sources money with which to pay an assassin to do the actual killing,—and that Lepley having taken, as his particular part of the plot, the raising of said money,—we find nothing in the testimony of Moye, in his narration of what he heard and saw in McClellan's garage, that supports in any degree the fact that the names of the three parties to be killed were mentioned in the meeting at McClellan's garage referred to. Nor does Mr. Moye undertake to set out what was said in said meeting by any of the appellants whom he claims were present. In the most general language he says "They all agreed," "They were having a conversation," "They wanted each one to raise as much as he could." He does

not undertake to say how many persons were in McClellan's garage at the time, but his testimony raises the inference that there was quite a company. If the witness was at all sure as to what was said by Shultz, Dargle and McClellan, it occurs to us that he might have named them and testified to the criminating facts tending to establish what each of these men said upon which a jury might be asked to conclude that they had made themselves parties to a conspiracy to murder the three men named in the indictment. We regard it as too serious a thing to take liberty and reputation from citizens of this state upon such general testimony.

Upon the trial, the court below gave a peremptory instruction for acquittal of one of the parties accused. Those appealing are Messrs. McClellan, Farnsworth, Dargle and Schultz.

We might have made more apparent our reason for our conclusion had we followed the process of exclusion, often resorted to in solving the question of the sufficience of the corroboration. Had we done so, and all the testimony given by Moye had been set out, it would have been plan that nothing would have appeared reasonably tending to connect the appellants with a conspiracy to murder the parties named in the indictment.

For lack of corroborating evidence, the judgment is reversed and the cause remanded.

*Reversed and remanded.*